# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 23, 2008 Session

## STATE FARM FIRE & CASUALTY CO. v. DAVID STONE, ET AL.

**Appeal from the Chancery Court for Blount County**
**No. 05-090      Telford E. Forgety, Jr., Chancellor**

---

### No. E2007-02342-COA-R3-CV  - FILED MAY 21, 2008

---

State Farm Fire & Casualty Co. filed a "Complaint for Declaratory Relief" with respect to the claim of David Stone seeking damages arising out of the death of his wife, Rhonda Stone,[1] who was killed by the alleged negligent driving of an uninsured motorist.  At the time of the accident, the Stones had a personal liability "umbrella" insurance policy with State Farm, which provided $1 million in personal liability coverage above and beyond the Stones' underlying insurance policies, including their automobile liability insurance policy.  Their umbrella policy does not, by its language, include uninsured motorist ("UM") coverage.  However, Mr. Stone argues that UM coverage should be read into their umbrella policy because the Stones did not reject such coverage in writing, which Mr. Stone says is required by the applicable statute.  State Farm argues that the statute in question, Tenn. Code Ann. § 56-7-1201(a) (2000), applies only to automobile insurance policies and does not impose the rejection-in-writing requirement on umbrella policies.  Based upon the parties' "Agreed Stipulations," the lower court, at a bench trial, agreed with Mr. Stone's interpretation of the statute. We disagree with the interpretation placed upon the statute by Mr. Stone and the trial court. Accordingly, we reverse.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Reversed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

David C. Hollow, Knoxville, Tennessee, for the appellant, State Farm Fire & Casualty Co.

David T. Black, Maryville, Tennessee, for the appellees, David Stone, individually and as surviving spouse of Rhonda Stone, and Laura Beth Stone, a minor, by and through her surviving parent, David Stone.

---

[1]The record is inconsistent with regard to the spelling of Mrs. Stone's first name.  Several documents drafted by Mr. Stone's counsel refer to her as "Ronda."  However, the policy documents, the court's memorandum and order, and various other filings use the spelling "Rhonda." The parties' "Agreed Stipulations" use *both* "Ronda" and "Rhonda." We do not know the proper spelling, but we have adopted the spelling used by the trial court.

# OPINION

## I.

The facts are not in dispute. Mrs. Stone was struck and killed by an uninsured motorist as she walked across a street in Maryville. At the time of the accident, the Stones had automobile insurance, including uninsured motorist coverage, with the United Services Automobile Association. They also had a State Farm personal liability umbrella insurance policy – the policy at issue in this case. The State Farm policy provides as follows:

> If you are legally obligated to pay damages for a loss, we will pay your net loss minus the retained limit [*i.e.*, "the total limits of liability of your underlying insurance"]. Our payment will not exceed [$1,000,000].

(Formatting omitted.) As already noted, their umbrella policy does not, on its face, provide UM coverage.

In the wake of Mrs. Stone's tragic death, United Services paid Mr. Stone $250,000 under the UM provision of the Stones' automobile insurance policy. Mr. Stone then sought payment from State Farm under his umbrella policy. State Farm filed a complaint in the instant case, asking the trial court to declare that it has no liability arising out of Mrs. Stone's accident because, so the argument goes, the Stones' umbrella policy does not provide UM coverage. However, the trial court reached the opposite conclusion, stating as follows in its memorandum and order:

> [T]he issue is whether an umbrella policy which does not *expressly* provide uninsured motorist coverage nevertheless provides such coverage where the insured has not rejected it in writing. It appears that this is a matter of first impression in Tennessee. The Court concludes that the umbrella policy here does provide uninsured motorist coverage because the insured did not reject it in writing.

(Emphasis in original.) State Farm timely appealed.

II.

A.

This case presents a pure question of statutory interpretation. "We review questions of law, including issues of statutory construction, de novo without a presumption of correctness." ***Davidson v. Lewis Bros. Bakery***, 227 S.W.3d 17, 19 (Tenn. 2007). Our inquiry is guided by well-established principles of statutory interpretation:

> This Court's role in statutory interpretation is to ascertain and to effectuate the legislature's intent. Generally, legislative intent shall be derived from the plain and ordinary meaning of the statutory language when a statute's language is unambiguous. If a statute's language is expressed in a manner devoid of ambiguity, courts are not at liberty to depart from the statute's words. Accordingly, courts are restricted to the "natural and ordinary" meaning of a statute unless an ambiguity necessitates resorting elsewhere to ascertain legislative intent.

***Freeman v. Marco Transp. Co.***, 27 S.W.3d 909, 911-12 (Tenn. 2000) (citations omitted). "[A] statute should be construed, if practicable, so that its component parts are consistent and reasonable; inconsistent phrases should be harmonized, where possible, so as to reach the legislative intent." ***State v. Odom***, 928 S.W.2d 18, 30 (Tenn. 1996). "[C]ourts must presume that the legislature is aware of prior enactments and of the decisions of the courts when enacting legislation." ***Ki v. State***, 78 S.W.3d 876, 879 (Tenn. 2002).

The statutory section at the heart of this dispute, Tenn. Code Ann. § 56-7-1201(a), provides, in its entirety, as follows:

> (a) Every automobile liability insurance policy delivered, issued for delivery or renewed in this state, covering liability arising out of the ownership, maintenance, or use of any motor vehicle designed for use primarily on public roads and registered or principally garaged in this state, shall include uninsured motorist coverage, subject to provisions filed with and approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover compensatory damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom.
>
> (1) The limits of such uninsured motorist coverage shall be equal to the bodily injury liability limits stated in the policy.
>
> (2) However, any named insured may reject in writing such uninsured motorist coverage completely or select lower limits of such coverage

-3-

but not less than the minimum coverage limits in § 55-12-107. Any document signed by the named insured or legal representative which initially rejects such coverage or selects lower limits shall be binding upon every insured to whom such policy applies, and shall be conclusively presumed to become a part of the policy or contract when issued or delivered, irrespective of whether physically attached thereto. Unless the named insured subsequently requests such coverage in writing, the rejected coverage need not be included in or supplemental to any continuation, renewal, reinstatement, or replacement of such policy, or the transfer of vehicles insured thereunder, where the named insured had rejected the coverage in connection with a policy previously issued by the same insurer; provided, that whenever a new application is submitted in connection with any renewal, reinstatement or replacement transaction, the provisions of this section shall apply in the same manner as when a new policy is being issued.

(3) *No uninsured or underinsured motorist coverage need be provided in this state by an excess or umbrella policy of insurance.*

(Emphasis added.)  Subsection (a)(3) was added by a 1996 amendment.  1996 Tenn. Pub. Acts, ch. 825.  State Farm argues that subsection (a)(3) exempts umbrella policies from *all* of the requirements of § 56-7-1201(a).  Mr. Stone, on the other hand, contends that subsection (a)(3) exempts umbrella policies only from subsections (a) and (a)(1), not from (a)(2), and that insurers therefore must still procure a written rejection from the insured in order to issue an umbrella policy without UM coverage.  The trial court appears to be correct that this case presents an issue of first impression, insofar as it concerns the applicability, if any, of subsection (a)(2) to umbrella policies in the wake of the 1996 amendment.[2]

---

[2] In *Holt v. Pyles*, No. M2005-02092-COA-R3-CV, 2007 WL 1217264 (Tenn. Ct. App. M.S., filed April 24, 2007), a section of this court upheld an umbrella policy that did not include UM coverage even though the insurer apparently did not get a written rejection, but the issue of statutory construction present in the instant case does not appear to have been raised or argued, and is not mentioned in the opinion.  In *Weiss v. State Farm Fire & Cas. Co.*, 107 S.W.3d 503, 505 (Tenn. Ct. App. 2001), the court appeared to assume, though it did not specifically hold, that Tenn. Code Ann. § 56-7-1201(a)(2) applies to umbrella policies – but although the case was decided in 2001, and although the court cites the current version of the statute, the written rejection occurred in 1993, prior to the 1996 amendment. Similarly, *Beam v. United Services Auto. Ass'n*, No. 03A01-9802-CH-00055, 1998 WL 823134, at *6 (Tenn. Ct. App. E.S., filed November 23, 1998), although decided in 1998, finds § 56-7-1201(a)(2) applicable to an umbrella policy on the basis of pre-1996 facts.  *Beam* specifically mentions the recent amendment in a footnote, apparently implying the court's awareness that the outcome might be different under the new statute – but the court does not elaborate on this point.

B.

Mr. Stone acknowledges that the 1996 amendment means, in his words, "umbrella policies are no longer required to provide UM coverage in Tennessee as a condition of doing business in Tennessee." In point of fact, umbrella insurers were never literally *required to provide* such coverage; rather, prior to 1996, they were required (as regular automobile insurance providers still are) to provide UM coverage *unless the customer rejects it.*[3] Therefore, when Mr. Stone argues that "while umbrella policies are not required to provide UM coverage, the providers . . . still must obtain a written rejection from the insured in order <u>not</u> to provide such coverage," he is describing precisely the state of the law *before* the 1996 amendment. (Underlining in original.) If we were to accept this formulation as an accurate description of present law, we would be declaring that the 1996 amendment changed nothing. "The Court has a duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant." ***McGee v. Best***, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002).

The old rule, that UM coverage was "required" unless "rejected," essentially meant that umbrella insurers were required to *offer* UM coverage, and the offer was presumed to be accepted unless it was specifically rejected in writing. In the absence of a written rejection, coverage was automatically read into any umbrella policy as a matter of law. Mr. Stone's argument implies that this is still the state of the law, but if the 1996 amendment means anything at all, it must mean that umbrella insurers are no longer required to *offer* UM coverage. Whereas providers' options were once limited to either offering umbrella policies with UM coverage (subject to rejection by the customer) or not selling umbrella insurance in Tennessee at all, they now have the discretion to offer umbrella policies without UM coverage, if they so choose.

Mr. Stone appears to endorse the view that umbrella insurers are no longer required to *offer* UM coverage, as he approvingly quotes the trial court's statement that "an umbrella carrier *may*, but is not *required to* offer uninsured motorist coverage." (Emphasis in original.) Yet this principle conflicts irreconcilably with Mr. Stone's contention that an insurer who wishes to sell an umbrella policy without UM coverage must first procure a *written rejection* of such coverage by the insured. Taken together, these contentions imply that, although *offering* UM coverage is no longer mandatory, UM coverage is still imposed by law on all umbrella policies unless the customer "reject[s] [it] in writing" – even if such coverage was *never offered*. We find this reading of the statute deeply illogical. One cannot "reject" something unless one has been offered that thing. Since there is no requirement that UM coverage be *offered*, there can be no requirement that it be *rejected.*

---

[3] This was always the state of affairs under the UM statute, and indeed it remains the governing rule for regular automobile insurance policies. The original version of the statute, which took effect in 1968, stated that "the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage[.]" 1967 Tenn. Pub. Acts, ch. 371; Tenn. Code Ann. § 56-1148 (1968). In 1982, the same amendment that added umbrella policies to the statute's ambit also changed the wording of the rejection rule to its present form. 1982 Tenn. Pub. Acts, ch. 835. In any event, whatever its wording, a provision that allows a customer to "reject" the "required" coverage has always been a part of the statutory scheme.

-5-

Prior to 1996, § 56-7-1201(a) gave insurers no discretion: if they wished to sell umbrella insurance in Tennessee, they were required to offer UM coverage, and the only discretion resided with the customer, who would be presumed to accept the coverage but could choose to reject it. As we have said, the 1996 amendment changed this rule, giving umbrella insurers discretion as to whether they would offer UM coverage. Mr. Stone purports to recognize this change in the law, yet his argument that the statute still mandates UM coverage unless the customer "reject[s] [it] in writing" is impossible to square with the plain meaning of the word "reject." The logical flaw in this argument is demonstrated by a statement made by Mr. Stone's counsel at oral argument: "They don't have to write it," he said of the UM coverage, but "[t]hey've still got to *tell you, the customer, that you're rejecting it*." Such a formulation is backwards. An offeror does not "tell" an offeree "that you're rejecting" an offer. That simply makes no sense. Yet this statement captures perfectly the essence of Mr. Stone's argument. In his effort to construct a interpretation of the 1996 amendment that does not result in the rejection of his claim of coverage, he is arguing that the statutory language allowing *the insured* to "reject" UM coverage should be read as imposing a requirement on *the insurer* to procure, in essence, a sham "rejection" of this non-mandatory coverage, *even when it is not offered* (which, Mr. Stone acknowledges, it need not be). This interpretation unambiguously contradicts the plain meaning of the statute.

In its memorandum and order, the trial court stated, imprecisely, that the insurance company "must get a written rejection *or acknowledgment* from the insured if the coverage is not provided." (Emphasis added.) Yet the statute says nothing about an "acknowledgment"; it speaks only of a "rejection." Specifically, again, it states that "any named insured may reject in writing such uninsured motorist coverage" – not that the insurance company must procure an "acknowledgment" from the insured that no such coverage is being provided. As noted earlier, we must give statutory language its plain and ordinary meaning, and the word "reject" plainly means something different than the word "acknowledgment." Mr. Stone asserted at oral argument that the "purpose" of the rejection requirement "is to inform the customer that they're not getting uninsured [motorist] coverage." But that is not what the word "reject" means. The plain language of the statute is clear and unambiguous: prior to 1996, an umbrella insurer was required to offer UM coverage, and all discretion resided in the customer to either "reject" or accept that coverage. After 1996, there is no requirement that UM coverage be offered, and thus there can be no requirement that it be either "rejected" or else provided automatically.

C.

In addition to misconstruing the word "reject," Mr. Stone also errs in his analysis of the statute's structure. In his brief, he states that subsection (a)(3) "create[s] an exception to subsections (a)-(a)(1), while leaving the requirements of subsection (a)(2) intact as to umbrella policies." In and of itself, however, subsection (a)(2) imposes no "requirements." Rather, (a)(2) is *itself* an "exception" to the "requirements" of (a) and (a)(1). Subsection (a) declares that certain specified insurance policies "shall include uninsured motorist coverage," and subsection (a)(1) mandates certain policy limits. Subsection (a)(2) imposes no additional requirements, but rather outlines the circumstances under which a policy that would otherwise be covered by (a) and (a)(1) may be *exempted* from the requirements of those subsections: namely, via a written rejection by the insured. If such a written rejection is received, then the requirements of subsections (a) – that the policy

"shall include" UM coverage – and (a)(1) – that the coverage shall have certain specified limits – are waived. Otherwise, the requirements remain in force. The key point is that the requirements themselves are imposed by subsections (a) and (a)(1), not by (a)(2). Subsection (a)(2) is an *exception* to the requirements.

It is therefore illogical to declare, as Mr. Stone does, that subsection (a)(3) removes umbrella insurance policies from the ambit of (a) and (a)(1), but not from the ambit of (a)(2). Subsection (a)(2) is entirely meaningless without (a) and (a)(1). Without its antecedents, (a)(2) is an exception to a nonexistent rule. It has no applicability to this case unless (a) and (a)(1) are applicable – which, as Mr. Stone correctly acknowledges, they are not, because subsection (a)(3) "create[s] an exception to subsections (a)-(a)(1)" for umbrella insurance policies.

On this latter point, the statutory language could hardly be clearer: "No uninsured or underinsured motorist coverage need be provided in this state by an excess or umbrella policy of insurance." Tenn. Code Ann. § 56-7-1201(a)(3). This is not, as the trial court held and Mr. Stone argues, a disfavored "repeal by implication." Rather, it is a very explicit and direct repeal of this statute's applicability to umbrella policies. Subsection (a)(3) declares that UM coverage shall no longer be mandatory under (a) and (a)(1) for umbrella policies, and thus (a)(2) has no further relevance because, on these facts, it is an exception to a rule that has already been excepted from.

D.

There is an additional basis for finding in favor of State Farm, albeit one that is given little attention in the briefs. The parties focus primarily on the *current* language of subsection (a)(3), as amended in 1996. However, the 1996 amendment did not merely *add* language to the statute; it also *deleted* language from the statute. Specifically, it deleted the previous incarnation of subsection (a)(3), which stated as follows:

> (3) Any umbrella insurance policy that includes automobile liability insurance shall comply with the provisions of this section so long as the underlying limits of uninsured motorist coverage are equal to the underlying limits of automobile liability insurance.

Tenn. Code Ann. § 56-7-1201(a)(3) (1994). This earlier version of subsection (a)(3) had been present in the statute since 1982, when it was added as part of a "complete re-drafting of sections 56-7-1201 and 1202." **Dockins v. Balboa Ins. Co.**, 764 S.W.2d 529, 530 (Tenn. 1989); 1982 Tenn. Pub. Acts, ch. 835. It was deleted in its entirety in 1996, and replaced with the earlier-quoted language stating that no UM coverage "need be provided" in an umbrella policy.

The parties argue extensively over the proper interpretation of the new, post-1996 language. We have already held that State Farm's interpretation is the correct one. However, it also appears to this court that the deletion of the old, pre-1996 language would be enough by itself to resolve the dispute in State Farm's favor, even if the new language were absent. Simply put, the legislature in 1996 removed the requirement that "[a]ny umbrella insurance policy that includes automobile liability insurance shall comply with the provisions of this section," and absent this language, there

-7-

appears to be no statutory basis for asserting that umbrella insurance policies are governed by *any* provision of § 56-7-1201(a).

The very first words of § 56-7-1201(a) state that the statute applies to "[e]very *automobile liability insurance policy* delivered, issued for delivery or renewed in this state, covering liability arising out of the ownership, maintenance, or use of any motor vehicle designed for use primarily on public roads and registered or principally garaged in this state[.]" (Emphasis added.) There is no language indicating that the statute applies to any *other* type of insurance policy – such as, for instance, umbrella personal liability policies. Again, there *used* to be such language, before 1996, when the old subsection (a)(3) stated that "[a]ny umbrella insurance policy that includes automobile liability insurance shall comply with the provisions of this section[.]" But that language is no longer part of the statute. Thus, cases such as ***Mullins v. Miller***, 683 S.W.2d 669, 670 (Tenn. 1984), which recite the applicability of § 56-7-1201(a) to umbrella policies, are no longer good law on that point, because the statute they are interpreting has been amended to eliminate the "hook" that previously brought umbrella policies within the statute's coverage.

In order to conclude that the Stones' umbrella policy falls under the ambit of the *current* version of § 56-7-1201(a), we would have to find that it is an "automobile liability insurance policy . . . covering liability arising out of the ownership, maintenance, or use of any motor vehicle designed for use primarily on public roads and registered or principally garaged in this state[.]" We are unable to make such a finding, because the Stones' policy simply *is not* an "an automobile liability insurance policy." This is true for at least two reasons.

First, basic rules of statutory construction make clear that the legislature intended to draw a *distinction* between "automobile liability insurance polic[ies]" and "umbrella insurance polic[ies] that include[] automobile liability insurance." By writing the latter language into the statute in 1982, the legislature implicitly, necessarily acknowledged that these two types of insurance policies are *not the same thing*. This acknowledgment was reaffirmed when the legislature *removed* the old subsection (a)(3) language in 1996, which we must presume was done with the intention of *changing* the statute. If we were to hold that "umbrella insurance polic[ies] that include[] automobile liability insurance" *are* "automobile liability insurance polic[ies]" – that these two distinct types of policies are actually one and the same – we would be declaring that the statutory language which prevailed from 1982 to 1996 was, throughout that 14-year period, entirely superfluous and unnecessary. We would also be announcing that the removal of that same language in 1996 did nothing to change the meaning of the statute. This we cannot do.

Secondly, the nature of umbrella insurance generally, and the Stones' policy in particular, makes clear that it is not an "automobile liability insurance policy." The Stones' policy is a *personal liability* policy. Whereas auto insurance follows the *automobile*, personal liability insurance follows the *person*. The umbrella policy at issue in this case required the Stones to have not just underlying automobile liability insurance, but also underlying recreational motor vehicle liability insurance, watercraft liability insurance, personal residential liability insurance, and residential rental liability insurance. The "umbrella" nature of the policy means that it could be triggered by personal liability in any of these contexts, or others. As stated earlier, the basic description of coverage simply says: "If you are legally obligated to pay damages for a loss, we will pay your net loss minus the retained

limit[.]"  This is far broader than any "automobile liability insurance policy."  Indeed, even the automobile-related terms of the umbrella policy are broader than standard, per-vehicle automobile insurance.  The policy states that it will cover liability arising out of the use of "an automobile, recreational motor vehicle, or watercraft owned by, rented by, or loaned to the named insured[.]" The particular automobile or automobiles driven by the insured are not listed on the policy documents in the record, and there is no language in the policy paralleling the statutory description of "any motor vehicle designed for use primarily on public roads and registered or principally garaged in this state[.]"  Again, this is not insurance for an automobile or automobiles, but insurance for a person or persons.  It is simply a fundamentally different type of policy than what is envisioned by § 56-7-1201(a).  Accordingly, we conclude that the Stones' policy is not an "automobile liability insurance policy" and therefore is not governed by § 56-7-1201(a).

### III.

For all of the foregoing reasons, the judgment of the trial court is reversed.  Judgment is hereby rendered in favor of State Farm.  Costs on appeal are taxed to the appellee David Stone.

_____
CHARLES D. SUSANO, JR., JUDGE